UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 12-10072-RWZ

UNITED STATES OF AMERICA

v.

JOSE SANCHEZ

MEMORANDUM OF DECISION

December 14, 2012

ZOBEL, D.J.

Defendant Jose Sanchez is charged with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He now moves to suppress all evidence, including the firearm at issue, derived from an encounter with Peabody police officers on February 23, 2012 (Docket # 16). He also moves to suppress a statement he allegedly made following his arrest as the fruit of prior illegality. The court held an evidentiary hearing on November 15, 2012.

**I. Findings of Fact**

Shortly after 11:00 a.m. on February 23, 2012, Detective Robert Church of the Peabody Police Department went to the Cheesecake Factory restaurant in Northshore Mall in response to a report that defendant, an employee of the restaurant, had "flashed" a handgun at a co-worker the previous evening. Upon arrival, Detective Church met with the general manager, Michael Carey ("Carey"), who took him to a small office at the back of the restaurant to discuss the incident. At that time, the

detective intended only to obtain information about the alleged incident and believed that defendant was not on the premises. Carey informed Detective Church that defendant was scheduled to come in for work that day at 11:30 a.m.

Carey identified the reporting employee and showed the detective an email he had received from another manager about the incident. In the email, that manager indicated that he had spoken with the employee, who chose to report the incident out of "concern[ ] for his safety and the safety of others." Gov't Ex. 1. The manager wrote that defendant told the reporting employee "that he needed one of these" as defendant pointed to the handgun.[1] Id. The manager also noted that, according to the reporting employee, defendant had stated "a while back that he would blow [sic] anyone here that messed with him."[2] Id.

Carey and Detective Church viewed a video recording generated by security cameras at the restaurant. The recording showed that the reporting employee and defendant had an encounter the previous evening in the employee locker room. Due to the grainy quality of the footage, Detective Church was unable to confirm that defendant had a handgun, but he believed that defendant's motions of lifting up his shirt and gesturing towards his waist corroborated the reporting employee's account.

Detective Church also received information from Peabody Police dispatch concerning the background of defendant. He learned that defendant had a lengthy

---

[1] It is unclear whether this alleged statement was referring to defendant (i.e., defendant needs a gun) or to the reporting employee (i.e., defendant was telling the employee that the employee needs a gun).

[2] The government's brief characterizes this statement as meaning "blow [away] anyone"; defendant's motion uses the phrase "blow them up."

2

criminal history, including entries for violent crimes and firearm offenses from 2001 and 2002; he was a suspected member of the Latin Kings, a violent street gang; he did not have a firearms license; and he had no outstanding warrants.

Shortly after reviewing the security video, Carey walked out of the office and returned with defendant at approximately 11:27 a.m. Carey testified that he had informed the detective that he was going to retrieve defendant. Detective Church, in contrast, recounted that Carey's exit was abrupt and unexplained, and that he (the detective) was in fact surprised and a little angry when the general manager unexpectedly brought defendant into the office. Defendant, wearing a bulky winter jacket, sat down in a chair close to the office door, which Carey closed and locked behind him.[3] Detective Church, who had been sitting at the opposite end of the room, correctly surmised that the person with Carey was defendant and immediately stood up out of concern that defendant may be armed.

Standing approximately one-and-a-half feet in front of defendant, Detective Church identified himself as a detective with the Peabody Police Department and asked defendant if had any weapons on his person. Defendant answered that he did not. Detective Church then stated that for his own safety and the safety of Carey, he was going to conduct a pat-frisk of defendant. In response, defendant quickly rose from his

---

[3] Carey testified that the office door locks automatically from the outside and that he also manually engaged the deadbolt from the inside so that the meeting would not be interrupted by other managers. Detective Church testified that he did not know that the door was locked and that he never directed Carey to lock the door. It is unclear whether defendant was aware that the door had been locked.

3

chair and attempted to run out of the office.[4] Detective Church testified that defendant's reaction gave him even greater concern that defendant was armed. The detective tried to stop defendant, and the two men engaged in a physical struggle by the office door. After several seconds, Detective Church pinned defendant against the wall and told him to cease resisting and to show his hands. Defendant refused to comply. Detective Church then drew his gun and placed it at defendant's head, at which point defendant stopped struggling.

Continuing to hold defendant against the wall, Detective Church radioed for assistance. Another Peabody police officer arrived on the scene at around 11:30 a.m. and conducted a search of defendant's person, finding a 9 mm pistol in the waistband of defendant's pants, a magazine loaded with ammunition in his pants pocket, and single round of ammunition in his jacket pocket. After defendant was handcuffed, a small "twist" of suspected heroin was found inside his wallet. Defendant told the officers that it was heroin.

## II. Conclusions of Law

### A. Timing of the Seizure

While there is no question that defendant was seized by the police prior to his arrest, the parties disagree over when that seizure occurred. Defendant argues that he was effectively seized at the moment Detective Church stood in front of him, identified

---

[4] Detective Church testified that defendant "shoved" him (or at least made contact with him) as he ran toward the office door, but defendant denies making initial physical contact with the detective. Carey, who witnessed the interaction from the other side of the room, was unable to confirm whether or not defendant pushed Detective Church upon rising from his chair. Surveillance video footage of the encounter is inconclusive on this matter.

4

himself as a police officer, and began questioning him.  The government maintains that there was no seizure until defendant's attempted flight from the office and his ensuing physical struggle with Detective Church.

"While the Fourth Amendment protects against unreasonable searches and seizures, not all encounters between law enforcement officers and citizens constitute seizures."  United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005).  A seizure "does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991); see also Smith, 423 F.3d at 28 ("[S]ince most tend to feel some degree of compulsion when confronted by law enforcement officers asking questions, such discomfort cannot be the measure of a Fourth Amendment seizure.").  Rather, a person is seized by the police only when the officer, "'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'"  Brendlin v. California, 551 U.S. 249, 254 (2007) (quoting Bostick, 501 U.S. at 434 and Brower v. County of Inyo, 489 U.S. 593, 597 (1989)) (emphasis omitted).

In determining if a seizure has occurred, the relevant inquiry is whether, in light of all the circumstances surrounding the encounter, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  Bostick, 501 U.S. at 439.  Some factors that might indicate a seizure include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, and the use of language or tone of voice indicating that compliance with the officer's

5

request might be compelled. United States v. Mendenhall, 446 U.S. 544, 554 (1980). Moreover, a seizure requires not only an assertion of authority by police, but also submission to that authority. California v. Hodari D., 499 U.S. 621, 626-29 (1991); Smith, 423 F. 3d at 31-32 ("where the seizure depends upon a show of authority, 'no seizure occurs until the suspect has submitted to that authority.'") (quoting United States v. Sealey, 30 F. 3d 7, 9 (1st Cir. 1994)).

Under the totality of the circumstances in this case, defendant was not seized until Detective Church stopped his attempt to flee. Detective Church did not actively seek out defendant at the restaurant that morning, but was unexpectedly faced with defendant in the office. Detective Church was the only police officer in the room, did not display or draw his weapon at that time, and did not touch defendant. He identified himself and approached defendant to ask questions, but did not restrict defendant's freedom of movement.[5] While Detective Church did inquire specifically whether defendant had a gun and indicated that he wanted to pat-frisk defendant, there is no evidence that these statements were presented in an accusatory or threatening tone. Most importantly, even if Detective Church did exhibit some show of authority, defendant did not submit to that authority and instead tried to run out of the office. "If a defendant manifests his belief that he has not been seized by attempting to flee, he has

---

[5] Defendant claims that he was physically restricted because Detective Church was "standing directly in front of and above" him in a locked room. Based on the testimony of Detective Church and Carey, as well as video footage of the encounter, I find that the detective, although he stood in close proximity to defendant, did not block his movement. As for the room being locked, "mere physical limitations on an individual's movement, not created by police, are insufficient to turn an encounter with police into a restraint of liberty." Smith, 423 F.3d at 30. This is particularly true given that Detective Church and possibly even defendant were unaware that the door had been locked.

6

not submitted to a show of authority, and therefore, has not been seized." Smith, 423 F. 3d at 31. Accordingly, the initial interaction between defendant and Detective Church did not rise to the level of a Fourth Amendment seizure, and it was only at the moment of their physical struggle that defendant was actually seized.

### B. Legality of the Seizure

Under Terry v. Ohio, 392 U.S. 1 (1968) and its progeny, "an officer may conduct a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." United States v. McKoy, 428 F. 3d 38, 39 (1st Cir. 2005) (citations omitted). A Terry stop may also be warranted "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229 (1985). "[T]he critical inquiry is whether reasonable suspicion arose under the *totality* of the circumstances." United States v. Andrade, 551 F.3d 103, 110 (1st Cir. 2008) (emphasis in original).

Defendant points to several factors which he believes undermine the legitimacy of his seizure at the restaurant. He contends that there were doubts about the veracity of his co-worker's report that he had a gun the day before; the story had not been corroborated by any other employees and no gun was actually visible in the surveillance video of the alleged interaction. Defendant notes that his encounter with the police occurred in his place of work at the time of his scheduled shift, not in a rival gang area, high crime zone, or late at night. He also disputes the significance of his criminal history since his firearms-related offenses were a decade old and were

7

unrelated to the alleged crime being investigated by Detective Church. Finally, he claims that he did not exhibit any suspicious behavior at the time he entered the office that would indicate that he possessed a gun.

Defendant's arguments are unavailing. The totality of circumstances facing Detective Church were clearly sufficient to support "a particularized and objective basis for suspecting" defendant of criminal activity. United States v. Cortez, 449 U.S. 411 417-18 (1981). The detective (1) knew that an identified employee had reported the night before that defendant had flashed a gun and had previously mentioned "blowing" away anyone who "messed with him"; (2) had read the email to Carey confirming the complaint; (3) had reviewed surveillance video depicting an encounter between the reporting employee and the defendant, in which defendant's actions were consistent with the complaint; (4) had received information from dispatch that defendant had a criminal history involving firearms and was a suspected member of a violent street gang; and (5) had learned defendant did not have a firearms license. Moreover, the defendant's attempted flight in response to Detective Church's expressed intent to pat-frisk further supported a reasonable suspicion that defendant was in possession of a firearm. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); United States v. Bates, 750 F.Supp.2d 342 (D. Mass. 2010) (defendant's flight in response to officers' approach, in addition to tip that he had a weapon, justified Terry stop). Given all the information Detective Church had at the time, his seizure of defendant was objectively reasonable.

**C. Legality of the Pat-Frisk**

Defendant claims that even if the seizure was justified under Terry, the subsequent pat-frisk which uncovered the gun was not. After a valid Terry stop, a pat-frisk for weapons is permissible "where the officer is justified in believing that the person is armed and dangerous to the officer or others." United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994). "It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met." McKoy, 428 F.3d at 39. The officer must have a particularized, objective basis – taking into account the totality of the circumstances – for his belief that the suspect is armed and dangerous. Id.

Here, Detective Church had ample reason to believe that defendant was armed and dangerous. Prior to his encounter with defendant, the detective knew that defendant had reportedly flashed a handgun at a co-worker the night before and had previously threatened to "blow [away] anyone here that messed with him." Detective Church also had information about defendant's criminal history, including entries for violent crimes and firearm offenses, as well as suspected association with a violent street gang. Defendant argues that upon entering the office, he did not exhibit the typical physical signs of someone with a concealed weapon (e.g., a bulge in his clothing, holding onto his pants by the waistband, using a "bladed" stance, etc.), but Detective Church observed that it was difficult to view defendant's posture and person beneath his bulky jacket and that defendant appeared nervous after the detective identified himself. Finally, when Detective Church asked defendant if he was armed

9

and told defendant he intended to conduct a pat-frisk for weapons, defendant attempted to flee – a reaction that confirmed the detective's suspicions that defendant had a gun and heightened his concern for the safety of himself, Carey, and the other people in the restaurant. Defendant's physical struggle against Detective Church and his repeated refusal to comply with the orders to show his hands further supported a belief that defendant was armed and dangerous. Given these circumstances, the pat-frisk was fully justified.[6]

### III. Conclusion

Defendant's motion to suppress evidence (Docket # 16) is DENIED.

|  |  |
|---|---|
| December 14, 2012 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |

---

[6] Defendant challenges the admissibility of his post-arrest statement regarding heroin based solely on its status as the "fruit" of his seizure and search. The government has indicated that it does not intend to use defendant's post-arrest statement at trial. In any event, because the seizure and search of defendant were valid, they do not provide a basis for suppressing the statement.